UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION**, <br><br> Plaintiff, <br><br> v. <br><br> **ROBERT D. DOTY, JR.** <br><br> Defendant. | Civil Action No.: <br> **COMPLAINT** <br> **ECF** |

Plaintiff Securities and Exchange Commission alleges:

## SUMMARY

1. This case arises from Defendant Robert D. Doty, Jr.'s role in Dynegy, Inc.'s materially misleading use of a structured-finance transaction called Project Alpha. Doty is Dynegy's former chief financial officer. In 2001, Dynegy implemented Alpha to enhance cash flow from operations by approximately $300 million and to realize an associated tax benefit of $79 million. Over approximately six months, Dynegy's accounting and tax adviser worked closely with Defendant and other members of the Dynegy deal team to structure Alpha in a manner consistent with generally accepted accounting principles ("GAAP"). In particular, the accounting and tax adviser warned Dynegy that certain forms of risk-hedging in the transaction would undermine Dynegy's intended accounting for Alpha and require Dynegy to record the cash flow from Alpha as a financing activity, rather than as cash from operations. Dynegy's failure to follow this advice would also eliminate the tax benefit.

2. In April 2002, it became clear that Alpha did not conform to the explicit guidelines that Dynegy's accounting and tax adviser had established. As a result, Dynegy's accounting and tax adviser withdrew its opinion letters previously issued regarding Alpha, and in November 2002, Dynegy restated its 2001 financial statements to eliminate $290 million, or 37%, of operating cash flow, and to eliminate the previously reported tax savings of $79 million, reducing Dynegy's net income by 12%.

3. On September 28, 2007, the Securities and Exchange Commission ordered Doty to cease and desist from committing or causing future violations of Section 17(a) of the Securities Act of 1933, Sections 10(b) and 13(b)(5) of the Securities Exchange Act of 1934 and Rules 10b-5 and 13b2-1 thereunder, and aiding and abetting or causing Dynegy's violations of Section 13(a), 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act and Rules 12b-20, 13a-1 and 13a-13 thereunder.

4. Based upon the Commission's Order and Doty's violations of the federal securities laws described above, the Commission seeks in this action an order (i) imposing a civil penalty against Doty pursuant to Section 20(d)(2) of the Securities Act and Section 21(d)(3) of the Exchange Act, and (ii) prohibiting Doty from acting or serving as a officer or director of a public company for a period of five years pursuant to Section 21(d)(2) of the Exchange Act.

## JURISDICTION AND VENUE

5. This Court has jurisdiction over this action pursuant to Section 22(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §77u(a)] and Section 27 of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§78u(e) and 78aa].

6. Defendant has, directly and indirectly, made use of the means or

instrumentalities of interstate commerce and/or the mails in connection with the transactions described in this Complaint.

7. Venue lies in this Court under Section 22(a) of the Securities Act [15 U.S.C. §77u(a)] and Section 27 of the Exchange Act [15 U.S.C. §§78u(e) and 78aa] because certain of the acts and transactions described herein took place in Houston, Texas.

## DEFENDANTS

8. **Robert D. Doty, Jr.**, age 49, of Houston, Texas, was Dynegy's Executive Vice-President and Chief Financial Officer during the relevant period. Doty joined Dynegy in 1991 after ten years as a tax practitioner in a public accounting firm and advanced through Dynegy's tax and finance departments before ascending to CFO in 2000. Doty permitted his CPA license to lapse after joining Dynegy and is no longer a CPA. Doty resigned from Dynegy in August 2002 and is now employed by a private company.

## OTHER RELEVANT ENTITIES

9. **Dynegy Inc.**, is an Illinois corporation headquartered in Houston, Texas. Dynegy's shares are registered with the Commission under Section 12(b) of the Exchange Act and trade on the New York Stock Exchange under the symbol DYN. During the relevant period, Dynegy's business consisted of production and delivery of energy, including natural gas, electricity, natural gas liquids and coal, to customers in North America, the United Kingdom and Continental Europe. In addition to energy production and delivery, energy trading was a key component of Dynegy's business during the relevant period.

# FACTS

## *Project Alpha Overview*

10.     Alpha was essentially a $300 million loan to Dynegy, disguised as cash from operations through the purchase and sale of natural gas.  Dynegy received loan proceeds in 2001 in the form of contractually assured natural gas trading profits.  The loan was to be repaid over Alpha's remaining term through contractually assured trading losses.  While structured as a complex sale of natural gas, Alpha had no business purpose aside from minimizing Dynegy's taxes and narrowing the gap between Dynegy's net income and operating cash flow.

11.     For Dynegy to report Alpha's cash flow as deriving from operating activity, rather than a loan, Dynegy's outside accounting and tax adviser required that Alpha exhibit characteristics of a commercial transaction.  For instance, Dynegy and ABG Supply (the parties to the gas supply contract) were required to bear some amount of risk.  To assure that such risk was present, the purchase price under the gas contract was partly fixed, exposing the buyer and seller to fluctuations in the market price of natural gas.

12.     The parties to the gas contract planned to hedge this commodity price risk by entering into certain derivatives – fixed-for-floating swaps – to substitute the market price of natural gas for the fixed price.  Similarly, the parties planned to hedge against fluctuating interest rates by executing interest rate swaps.  Such hedging was necessary to guarantee the lenders' return.  Although the reduction of risk was acceptable to a point,

Dynegy's accounting and tax adviser warned that certain hedging activities would invalidate Alpha's accounting benefits.

### *Issues Relating to Hedging*

13. Dynegy's accounting and tax adviser notified Dynegy that, for Alpha to qualify for the desired accounting treatment, Alpha's commodity price swaps and interest rate swaps (and other derivatives) would have to be conducted in the ordinary course of business. Specifically, the swaps could not be linked to the gas contract or to each other. Any provision in one swap, such as a default provision, that would also have an effect on another swap, such as triggering an automatic termination or a right of termination, would require Dynegy to treat Alpha as a financing. Contrary to this advice, Dynegy entered into commodity price and interest rate swaps with contractual linkage in the form of cross-termination or "tear-up" provisions. Moreover, the impermissible tear-up provisions were documented in amendments to the swap confirmations, executed simultaneously with the confirmations they purported to amend.

14. The equity investors in ABG Supply and the other Alpha SPEs were required to be independent of Dynegy and contribute at least 3% (approximately $10 million) of the SPE's total capitalization. The 3% equity investment had to remain at risk throughout Alpha's term, including exposure to the most significant risk in a gas purchase arrangement: commodity price risk.

15. On or about April 6, 2001, Dynegy's accounting and tax adviser issued Dynegy a letter under Statement on Auditing Standards 50 (the "SAS 50 letter"). The SAS 50 letter instructed that any hedging of commodity price risk could not extend to the minimum 3% equity investment in the SPE ABG Supply. The SAS 50 letter also rested

on representations that, aside from certain specified derivative transactions, there would be "no residual insurance, residual guarantee, or any other type of investment or instrument . . . that would ensure ABG's equity investors' recovery of their portion of the ABG required minimum equity investment." The SAS 50 opinion also was based on an assumption that the "equity contributed will be … at risk for the life of ABG [Supply]" and "will not be guaranteed in recovery or return through financial hedges or other mechanisms." The 97% debt capitalization could, however, be hedged, and face no commodity price risk.

16. Contrary to these principles, Dynegy and certain of its employees facilitated the equity investors' hedging of all price and interest rate risk – at Dynegy expense – and even funded a swap that ensured the equity investors would have a claim functionally equivalent to Dynegy senior unsecured credit. In particular, the equity investors established a holding company – ABG Holdings LLC – as ABG Supply's parent. ABG Holdings housed the equity investments and executed the hedges that protected the equity. Because of the ABG Holdings hedges, the equity was not at risk under GAAP.

17. Further, according to the April 6, 2001 opinion issued by Dynegy's accounting and tax adviser, the Internal Revenue Service requires that structured tax transactions, at a minimum, have some non-tax business justification. According to the tax opinion, Dynegy's desired *accounting treatment* of the Alpha cash flow – as flowing from operations, as opposed to financing – constituted the primary non-tax business justification for Alpha. Consequently, when Dynegy publicly disclosed that it would

restate its 2001 cash flow statement to reflect the Alpha cash flow as financing, rather than operating cash flow, the accounting and tax adviser withdrew the tax opinion.

### *The Restatement*

18. On September 24, 2002, the Commission entered a settled cease-and-desist order against Dynegy making findings that Dynegy engaged in securities fraud in connection with its disclosures and accounting for Alpha. The Commission ordered Dynegy to cease and desist from violating, committing or causing violations of Sections 17(a) of the Securities Act, and Sections 10(b), 13(a) and 13(b)(2) of the Exchange Act and Rules 10b-5, 12b-20, 13a-1, 13a-13 and 13b2-1, thereunder.

19. On September 30, 2002, the U.S. District Court for the Southern District of Texas entered a Final Judgment by consent in which Dynegy was ordered to pay a $3 million civil penalty for its violations of the federal securities laws described above.

20. On November 15, 2002, Dynegy filed a Form 8-K restating its 2001 financial results by reporting approximately $290 million of Alpha-related cash flow as deriving from a financing activity rather than operations; eliminating the $79 million Alpha-related income tax benefit; and consolidating the assets, liabilities and results of operations of the SPE ABG Gas Supply into Dynegy's financial statements, increasing Dynegy's reported indebtedness by approximately $280 million. The increased debt reflects ABG Supply's borrowing to cover the losses it sustained during the first year of Alpha.

### *Doty's Role*

21. Doty, Dynegy's then-CFO, was involved in the decision to proceed with Alpha in order to minimize the gap between Dynegy's reported net income and operating

cash flow, and to realize a related tax benefit. In addition, Doty was involved in the decision not to make any separate disclosure of Alpha's unique, non-commercial pricing characteristics, or that 37% of Dynegy's 2001 operating cash flow originated from a syndicate of off-balance-sheet lenders, or that 12% of Dynegy's net income derived from a tax shelter that had never been tested in court or approved by the IRS. Doty knew or was reckless in not knowing that these and other characteristics of Alpha rendered Dynegy's financial presentation inaccurate and required separate disclosure of Alpha.

22. Further, Doty took no steps to prohibit or monitor hedging of risks by the sophisticated financial institutions serving as equity investors. Finally, Doty knew that Alpha's primary business purposes were minimizing taxes and manufacturing operating cash flow. Nonetheless, when Alpha's existence was exposed in an April 3, 2002 newspaper article, Doty emphasized the "substantial source of physical gas supply" provided by Alpha, while downplaying Alpha's cash-flow effects.

## FIRST CLAIM
### Section 20(d)(2) of the Securities Act and Section 21(d)(3) of the Exchange Act

23. Paragraphs 1 through 22 are realleged and incorporated by reference.

23. Based on Doty's violations of the Securities Act and Exchange Act described above, which involved fraud, deceit, manipulation or deliberate or reckless disregard of a regulatory requirement, and which resulted in substantial losses or created significant risk of substantial losses to other persons, Doty should be ordered to pay a civil penalty pursuant to Section 20(d)(2) of the Securities Act and Section 21(d)(3) of the Exchange Act.

## SECOND CLAIM
### Section 20(d)(2) of the Exchange Act

24. Paragraphs 1 through 24 are realleged and incorporated by reference.

25. Based on Doty's violations of the Exchange Act described above, and pursuant to Section 20(d)(2) of the Exchange Act, Doty should be prohibited from acting or serving as an officer or director of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act or that is required to file reports pursuant to Section 15(d) of the Exchange Act.

## REQUEST FOR RELIEF

The Commission respectfully requests that the Court:

1. Find that Defendant committed the alleged violations;

2. Order Defendant to pay a civil monetary penalty in the amount of $120,000 pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)];

3. Prohibit defendant from acting or serving as an officer or director of a public company for a period of five years; and

4. Grant such other relief as this Court may deem just or appropriate.

Respectfully submitted,

*/s/J. Kevin Edmundson*
J. KEVIN EDMUNDSON
(Attorney in Charge)
Texas Bar No. 24044020
SDTX No. 24109
TOBY M. GALLOWAY
Texas Bar No. 00790733
SDTX No. 18947


Attorneys for Plaintiff
SECURITIES and EXCHANGE COMMISSION
801 Cherry St., 19th Floor
Fort Worth, Texas 76102
Office:  (817) 978-1411 (jke)
Fax:     (817) 978-4927